The first case for argument this morning is 18-1335, Cosmo Technologies v. Actavis. Mr. Knarr. Seeing you for the second time this week, I recall. May it please the Court. The District Court construed the term macroscopically homogeneous composition to mean a composition of a uniform structure throughout as observed by the naked eye. Because it observed varying yellow flecks in the Actavis pill and bumps and holes in the Alvagen pill that were, quote, not evenly distributed, it found no homogeneity. The District Court's conception of uniformity, effectively an ordered arrangement of ingredients, is inconsistent with, first, the patent and prosecution history, second, testimony of skilled artisans on uniformity, and third, testimony that it was literally impossible to achieve. Your complaint is that he relied on his naked eye issue at all, or just he shouldn't have relied solely on this? Because some of his looking at it was clearly invited by statements you all made on the record. Absolutely. So what's your bottom line? I think the fundamental difference is that the visual appearance is relevant evidence, but he made it the definitive standard in Appendix 26 when he said, even if you prove uniform dispersion, you still have to prove with the naked eye. We think that's incorrect. But I'd really like to focus initially on the uniformity structure. Can you just clarify for me, what do you think that the proper meaning is of this claim phrase? Well, what it means is at a scale observed by the naked eye. I'm sorry, what is supposed to be true at that scale? At a scale doesn't yet tell you what you're looking for. Well, it just distinguishes the type of analysis, microscopic versus macroscopic, and at the claim hearing there was really no distinction, so you're not doing microscopy. Right, but what you just said doesn't say anything about the meaning of the word, is it homogenous or homogeneous? Right, homogeneous is uniform structure throughout, and I'd like to turn to that. Your view is it means uniform structure at a scale that the eye can see? Yes, that's right. So at pages 7 to 8, which I think is a good place to start on uniformity, the patent at column 2, line 29, distinguishes prior art reservoir structures from the invention because, quote, they were, quote, not macroscopically homogeneous along all the symmetry axis of the final form. And in prosecution, and this is illustrated in the graphics at page 8 of the blue brief, the patentee distinguished the uniform structure of the invention from a specific prior art reservoir structure. It did not distinguish prior art pills with visible specks and bumps. And indeed, in prosecuting the parent application, at appendix 2146, the patentee said, if the components are, quote, dispersed in a matrix structure, the resulting structure is, quote, uniform and homogeneous. So homogeneity requires no specific degree of dispersion. And the specification teaches what the patent understood by homogeneity. The examples in eight places discuss homogeneous mixtures. And I want to take the court to appendix 100 and example 1 because it includes the yellow excipient, soy lecithin. And example 1 states that the lecithin mixture is brought to homogenization. Then you heat the resulting granules until, quote, homogeneous dispersion. And then further mixing, quote, homogeneously dispersing the powders. So a person of skill in the art would not understand example 1 to require him to line up evenly all the multiple excipients and make sure there are no randomly appearing dots throughout the mixture in the blender. And then the patent further teaches for the tablet that compression, and this is appendix 100, column 5, line 5, compression of a homogeneous mixture into a tablet, quote, yields a macroscopically homogeneous structure in all its volume. Namely, a matrix containing a dispersion of the lipophilic granules and the hydrophilic matrix. So this argument goes to the blend uniformity and the content uniformity test, correct? No, that's just evidence. This is just about the meaning, the standard of what uniformity means. So it means that – But there are tests that – Right. And we think it's necessary – And one is blending and one is content uniformity. Exactly. That's right. And the court found that that was not enough. And you invited the court to basically eyeball the appeal and to determine whether it was uniform or not. Right. And that's one form of relevant evidence. But my point here is that homogeneity is satisfied by a dispersion, not perfect or even dispersion. And the skilled artisan so testified. Dr. Davis testified to this understanding at Appendix 265, line 14, saying, quote, if the material were all mixed well together, then it would be homogeneous when you look at it with the naked eye. And Dr. Katravada, who is Agtavis' product formulator and a skilled artisan, had a similar sense of uniformity. He testified in observing the broken tablets with his naked eye that – and this is Appendix 279, line 22 – that, quote, I didn't see any pockets of exhibients. And, quote, it appeared to be uniform in color. And then on the next page, line 14, he testified that he did not observe any non-uniform distribution in the broken tablet. Quote, it all looked the same to me. And so skilled artisans like – But doesn't that – to the extent that you're talking about claim construction, doesn't the material that you were just quoting rather support what Judge Chief Judge Stark did? That is, it's translating into evenness of the appearance when looked at with the naked eye. No, but Dr. Katravada looked at the pills and he said, not uniform. And he's a skilled artisan. Dr. Davis looked at the magnified photos. He said, I don't see a non-homogeneous distribution in yellow specks or beads and exhibients. And so – and this is consistent with the court's interpretation of uniformity in superannus. And if the patent doesn't specify a degree of uniformity and doesn't adhere, then uniformity inherently means not localization. There just needs to be some degree of uniformity. And where the district court went astray was that it relied on the testimony of Dr. Joshi, Alvagen's product developer, who was evidently at pains to distinguish its product from the claims. And he testified at appendix 292, line 22, that it is, quote, physically impossible to achieve a uniform mixture in a multi-particulate system. And the district court embraced this absolutist concept of uniformity, which is not the concept of the patent for the skilled artisans, at appendix 27, last paragraph, when it found, citing Dr. Joshi, that even though Alvagen, quote, achieves – or targets achieving the best possible mixture of the beads with the powder and preventing segregation, it does not target a uniform composition. So this conception of an impossible uniformity that excludes the best possible mixtures that are tabulated without segregation is not the uniformity of the patent. The patent doesn't claim – Was the testimony that you were just describing, this is what Derek, one of the defendant's experts – One of his primary – the product formulator. Right. Was that testimony about impossibility at a sub-human eye visible level? No. He just said that it's – he said that you can't – he even said you can't mix these macroscopic particles with the excipients because of their different sizes. And so he was saying that's a standard characteristic of a multi-particulate system. And the patent clearly covers multiple size particles. You see in column 4 to 5 how many particles they have. And indeed, this conception excludes the only bedecinide embodiment in the patent, which is example 2, and that's on appendix 100. And example 2 says that you mix bedecinide with other excipients to a homogeneous dispersion and you combine it to form granules of up to one millimeter in size. And then you mix those granules with more excipients to a homogeneous dispersion and mix it again with more excipients and tablet it. If you were to bisect an example 2 pill, the granules, which are more than twice the size of Alvagen's beads, would appear visibly distinct and randomly distributed. Because as Dr. Joshi said, it's impossible to get ordered arrangement in a mixture. And so this conception of uniformity, at page 43 of defendant's brief, where they say if you have visible particles against surrounding excipients, cannot be maintained as a standard of the patent. And again, their products have to be homogeneous, because the product works by the excipients controlling the steady release of the active ingredient as the product travels through the colon. So you have to be dispersed to do that. And to deny macroscopic homogeneity is to deny the function of their products. I'd also like the last point on uniformity. The district court could not properly devalue Dr. Davis' testimony from the photographs. If you look at the color photographs at appendix 1579 to 1581, and particularly 1581 is Octavius, you can see the visible yellow specks. In 1579 to 1580, you can see the bumps and holes. And so everything is visible there that the district court described. So the district court couldn't just throw out this testimony based on theoretical deviation between a pill and a photograph. He had to find that what was apparent in the photographs that Dr. Davis saw did not reflect the essential structures that he saw in the actual pill. Otherwise, he can't just throw out the testimony of a skilled artisan who said, I don't see non-homogeneous yellow specks and bumps. And furthermore, we're only on Rule 52C after a plaintiff's case. There's no other evidence from the other side. Dr. Katragada's testimony is enough, but certainly with Dr. Davis' testimony. Look at appendix 25 and footnote 7. And I'd like your explanation of that exchange between plaintiff's counsel and the court. Yes, so again, we've always said that it's relevant evidence. And it is relevant evidence in the limited circumstances. Why is this dispositive? Doesn't this describe what a person skilled in the art would observe with the naked eye? And you invited the court to take a look at it. And that a layperson could also be able to discern the— What we said is, he said, if you saw a non-uniform distribution. But a non-uniform distribution, as I just pointed out, is one where there's localization or segregation. If you see a big pocket of the recipients like Dr. Katragada did not see, then he's saying, yes, you could infer that throughout the whole volume. And this is also why the naked eye test is not the proper test. Because— You're not answering my question. Look at that footnote and explain that to me. Because you invited the court and you made certain statements there. Yes, exactly. And so what—and I'll pull it up exactly. Those statements seem to be somewhat dispositive to me. The concern I have with your case is— I guess it's that old saying, whether you've been raised by your own petard. I don't think we have, Your Honor. But just on this, if you look at what he says, if the yellow—and it's, I'll just say, an excipient— is indeed not distributed uniformly. So he said, that's a conditional, right? Which I don't think is the case here. That it would be an excipient that's not uniformly distributed and therefore we'd have a non-macroscopically homogeneous composition. So if you were to look at a pill and you'd see a reservoir structure, layered structure, or a clearly segregated pocket of excipients, which is a de facto structure, then you don't have uniformity. That's all he's saying. He's not saying that any yellow flecks, any minute variation, because that's against the testimony and it's against the patent and it's practically impossible. But the other problem with the naked eye test, which is why it has to be a scale limitation, because that's of course what macroscopically means, is that a naked eye test cannot reliably determine homogeneity. It is only in the happenstance, where you happen to have visible shapes or visible colors, that it can possibly find non-homogeneity. I see I'm actually out of time. You're completely done. We'll restore some time for questions. All right. Split time. Mr. Jay, are you arguing different things? We are, Your Honor. Good morning. I represent activists. I'll be addressing the common issues and any issues relating to activists' products specifically, and then I'll be followed by Mr. Morata, who represents Albogen. He'll address the Albogen product if there are questions specific to that. Of course, we'll answer whatever questions the court wants to put. So good morning. I'd like to begin with the district court's factual findings because I think especially in light of the position that counsel took this morning, that this really is a case about the findings made by the district court and not a question about how to construe the claims. The district court found, as a matter of fact, reviewing all the evidence submitted in the top half of the case, that the activists and Albogen products do not infringe because they do not contain a uniform distribution of all the ingredients. They are not a uniform composition. And that's the construction that plaintiffs urged. That's the construction that the district court applied throughout the case. So I'd like, if I can, to begin. Can I ask you something that confused me a little bit? When the district court was making those findings and using the notion of uniformity, I guess I was thinking that might mean either of two different things. One is looks like single color, like single color paint. It might also mean you can see flecks, but the flecks are really quite evenly distributed across the surface that you're looking at. So like flecked paint, but any given narrow field of the surface looks pretty much like any other. Which of those two was the district court using? At page 25, the district court found, and this is, I think, accompanying the footnote call for footnote 7, that there was a non-uniform distribution of the disuniformity. So even if you thought that evenly distributed flecks would still be a uniform composition, the district court specifically found that in both products there was a non-uniform distribution of the disuniformities. You saw the yellow dots in the activist product and the bumps and holes in the Alvagen product. So even that, I think, really is central to our submission, that this is a clear error case about what the district court found rather than a dispute about what the meaning of uniformity is. Because even if you thought the meaning of uniformity encompassed a uniform distribution, a loaf of raisin bread in which the raisins are all perfectly spaced apart from one another, that's not what the district court found here. We wouldn't agree with that construction either, but the court doesn't even need to reach that to affirm the findings made by the district court. And I trust you think that Mr. Kinnaird's arguments are really directed to the stronger view of uniformity, that it has to be a single color in which you don't, anywhere on the surface you're looking at, see variations. I do take Mr. Kinnaird to be saying that there can be visible variations as long as there is, I think what he described as a uniform distribution or the other phrase that I heard him use was, some degree of uniformity. But that's not how we read either the construction or the patent, that uniformity throughout, or a uniform structure throughout, is the construction that the district court applied. But in any event, I think that's really a theoretical debate. In a case where the district court has made a finding that not only are there disuniformities, but the disuniformities are distributed unevenly. And that would be enough under, I think, even under a some degree of uniformity construction. We also don't think that some degree of uniformity is an accurate representation of what it means to have a uniform structure throughout. I suppose if you zoom far enough out, everything is uniform to some degree. Here, I think we and the plaintiffs agree to this extent that the scale at which the disuniformities are to be assessed isn't the macroscopic scale. A scale visible with the naked eye, or at least something large enough to be seen with the naked eye. Mr. Kinnaird is right that you can't establish homogeneity just by visual inspection of a single cross-section, but you certainly can establish non-homogeneity. You can establish heterogeneity if you split open the tablets and you see disuniformities large enough to be seen with the naked eye. And the counterpart point to that is that if you see non-homogeneity along a plane, then by definition there is non-homogeneity in the three-dimensional view also. That's exactly right. You could take a cross-section of a loaf of raisin bread and not see any raisins along the plane that you've chosen to bisect, but if you do see some raisins unevenly distributed, it follows that the raisins are unevenly distributed in the loaf of raisin bread. And I think that this basic point is stated in page 14 of the reply brief, in which the other side agrees that if you bisected a tablet and saw a reservoir in it, that that would be persuasive evidence that the tablet does not infringe because they agree that something with a reservoir in it is not of a uniform structure throughout. It is not macroscopically homogeneous. Now, they certainly added the limitation to get around some prior art that had to do with reservoirs, but they didn't add a limitation that said, add not a reservoir. They added a limitation that said, macroscopically homogeneous composition, and they proposed construing that as uniform structure throughout. That's certainly more definite than not a reservoir, but it's also more rigorous. They sacrificed claimscope for definiteness. They wrote a specific limitation, and that's the reason that the tablets, in this case, don't infringe. And what do you say about Mr. Kinnear's point about example two showing, I forget whether it was one millimeter or two millimeter structures, which would certainly be visible to the naked eye, assuming a certain level of vision. It says size below one millimeter. That's right. Below. Yes, that's what it says. So it can be up to. Exactly. And that, of course, is the starting point of that process. So nothing in the example says that the finished product is homogeneous at any scale. The portions that Mr. Kinnear is talking about are early in the combination process. And do we not know enough about the process to know that the one millimeter particles remain one millimeter or might be diced up? The patent doesn't say that. There's nothing in the record about that, that the particles remain one millimeter as they go through this process. And, of course, the final step is compression. And you certainly can't infer that the particles  And Mr. Kinnear's statement that the granules survive compression, none of that is in the patent. But in any event, example two is not the formulation that the defendants are using here. So even if a formulation that looks like example two results in a macroscopically homogeneous composition, which, again, the patent doesn't say, that doesn't mean that every formulation involving budesonide is going to result in that. And I think that the clearest illustration of that is that one of the excipients in example two is stearic acid. And one of the other patents asserted against activists at trial had a stearic acid limitation. And the district court granted judgment on partial findings at mid-trial, which the plaintiffs have not appealed, because activists doesn't have stearic acid in its formulation. So it's certainly possible to make a generic version of Euceris without using all of the same excipients and certainly without it necessarily being the same formulation that is described in example two. So I'd like to turn, if I can, to the pictures, because I think that's a substantial proportion of Mr. Kinnaird's submission. These are the 1579 and 81s that Mr. Kinnaird was discussing. Correct. There are three photos, two of the Alvagen product, one of the activist product. And I really would just like to make a couple of key points about that. One, Dr. Davis admitted at page 257 that he could not verify that the photos depicted what you would see with the naked eye. And the district court, I think, started from that, that even if you thought that the photos don't depict any disuniformity, that that doesn't tell you that when you open a tablet and look at it, that there will be no disuniformity visible with the naked eye. The district court, of course, looked at actual tablets. And now the photographs themselves depict the tablets that the defense experts examined, discussed in their reports, and were prepared to testify about in the bottom half of the case. And they would have submitted the actual tablets themselves. So these certainly are photographs showing the tablets or tablets like the ones that the defense experts looked at. But it does not follow that even if Dr. Davis looked at them and said, I don't see any disuniformity, that that's enough to establish that the product doesn't infringe. And I think if you look at the second Elvigin photograph at page 1580, you can see the district court's point about why the best evidence is a tablet and not a photograph of a tablet, because you can see the washed-out white areas and the shadows that result from the uneven lighting in that photo. That's exactly what the district court said, that factors like lighting are reasons why he doesn't think that the photographs are the best evidence. I think we'd also refer to factors like scale, but the scale here is maybe double real-life size, but not very different. These pills are like one inch? That's a centimeter. That's a centimeter? So it's 0.9 centimeters, and the activist one, the one with the blue line. So that's blown up maybe four times. The activist one is blown up four times. I'm not sure what the scale is on the other one. When the content uniformity and the blending uniformity test that manufacturers use, doesn't that result in the microscope homogeneous composition? It does not, Your Honor, because it doesn't test for that, and there's no reason to think that. It doesn't test for it, but doesn't it result in that? No, there's no reason to think that it results in macroscopic homogeneity, because the FDA wants each pill to contain the same amount of active ingredient within a certain range of tolerance. Now, even that certain range of tolerance might well be enough to defeat macroscopic homogeneity. But again, the tests prescribed by the FDA are for testing this pill against that pill or this portion of the blend against that portion of the blend. Those are dissolved in solution, and then the amount of active ingredient is measured. It doesn't tell you anything at all about how the excipients or the active are distributed within a particular tablet. So, for example, we all know that a tablet with a reservoir in it would not infringe. That's conceded. The other side says that was the purpose of adding this limitation. But a tablet with a reservoir in it would come out exactly the same way from blend and content uniformity testing, because it would have the same amount of active ingredient in it, it just would have it arranged in a different way. So that doesn't tell you anything about the arrangement within a particular tablet, but the other side has chosen to claim the arrangement within the particular tablet core as the key limitation in this case. So we think that's the main reason why the district court did not clearly err in explaining the limitations of blend and content uniformity testing. And the other side, I think, has attempted to use documents from the Alvagen and Activist Andas. But as the district court said, there's really only one reference to homogeneity. That's talking about the active ingredient, and it's talking about the blend. So this is the portion from page four of Activist Andas, the executive summary, which is also what Dr. Davis relied on in saying, I can tell that because of blend and content uniformity, there's actually uniformity in excipients. He's relying on a sentence that, if you look at it, is clearly talking only about the active ingredient, because the executive summary hasn't said one word about excipients until after that sentence is already. So look at footnote seven, appendix 25. Is it your view that that exchange is dispositive in this case? I take Mr. Kinneard at his word that he doesn't think that the council conceded that the yellow dots that the district court could see were lecithin. We don't think that any other conclusion is possible, but I'm not saying that council Is there a concession there of infringement? I think that the concession is that if the lecithin is distributed in an uneven way throughout the tablet at a scale that is visible to the naked eye, that that would not infringe. And I think that the district court proceeded to find that he could see the yellow dots, that the yellow dots corresponded to lecithin in the activist product, and that therefore the activist product did not infringe. Why do you think that's not dispositive here? We think it's dispositive. We think that the concession about the construction, that an uneven distribution of lecithin would be enough to defeat infringement. Combined with the finding the district court made, that is dispositive. And I do think that even though the other side did not say, and we can see that those yellow dots are lecithin, we also don't think that there's any other conclusion that the district court could reach here. And again, I see that I'm over my time, but just one sentence to sum up, which is that in order for them to reverse partial findings by the district court based on all of this record, they have to convince this court that the only finding the district court could have made on the record so far was a finding of infringement and not non-infringement. In other words, if the non-infringement finding was clearly erroneous based on all of the evidence, and in this case, somewhat unusually for mid-trial, some of the evidence submitted by the plaintiffs in the top half of the case wound up defeating the plaintiffs' theory. Thank you. May it please the court. Jason Morata for Alvagen. Under either a scale limitation or an actual visual observation standard, there is no competent evidence that Alvagen's product is of a uniform structure throughout. Judge Stark properly found that Alvagen does not even have a goal of having a uniform composition because it has two separate structures in it. It has beads that are large and a separate powder structure. Now, Dr. Davis and even counsel here today admitted that these beads are observable and can be seen with the naked eye in the product. Now, the claim construction calls for a uniform structure throughout, and we believe that means that it's the same structure throughout. So in Alvagen's product where you can see tablets at a macroscopic scale in one part and powder structure through a separate macroscopic observable part, that's just not uniform. It's not the same. Okay. Can I ask you, did the district court make for your product the same finding made on page 25, appendix 25 at the sentence with footnote 7 call that the court made about Mr. J's client's product? No, he did not. Judge Stark did not expressly say that the holes and the bumps that he saw were the beads. But nevertheless, when counsel for plaintiffs was asked about that, counsel stated that he can conclude that those are the beads that are uniformly distributed according to that. Let me just see if I can make what's in my head a little bit clearer. So I asked Mr. J whether the uniformity or lack of uniformity, I'm sorry, that was found by the district court was you can't see any different colors anywhere, or whether it was merely that even though you might see some different colors, those specs were really quite evenly distributed. And as to activists, the sentence with the footnote 7 call appears in fact to say that the judge found that as well. So that any visible flecks were themselves not evenly distributed. Did the judge make the same finding for your product? Yes, the judge found that the holes and bumps were not evenly distributed throughout the bisected tablets, and that's at APPX 25. And so, again, he's found that he sees these bumps and these holes. They're not even in a perfect arrangement or even evenly distributed. He says that they're not evenly distributed throughout the bisect. So two sentences later. Yes. Okay, thanks. And in plaintiff's brief, reply brief at 9, they say whether something is macroscopic is determined by its size. And really that ends the inquiry. We have here beads that are of a size that can be visually observed, and they're not uniformly distributed throughout, and they're not even uniform with a powder structure. Now, we think that the judge properly rejected plaintiff's remaining evidence. The blending content, uniformity, Dr. Davis admitted this has nothing to do with the arrangement of drug and other excipients in the tablet. And, in fact, with content uniformity, he said it doesn't tell you how the beads are arranged in the finished product. The photographs also, we think that here they're good enough certainly to see the non-uniformities. And, in fact, counsel told us he sees the holes and the beads. So that tells us that they're good enough to show the non-infringing structure. But in order to say that they show uniformity, they have to be at a level that can be seen at the naked eye. They show the same amount of detail. Because low resolution can hide the details that would otherwise be visible. And, of course, we heard Dr. Davis admitted he couldn't draw that link. I see I'm out of time if there's no questions. Thank you. Thank you. Your Honor, I only have three very quick points. First, their construction absolutely excludes example two, the preferred embodiment. And the reason is, so he speculates, so maybe compression will destroy these granules. These granules are the three excipients that are controlling the release. They can't be destroyed. And, furthermore, all the testimony is the only thing compression does is to preserve the segregation in the blend. It doesn't destroy the structures. That's not what you do with compression. And that's true in the patent when it says if you compress a homogeneous mixture, you yield a macroscopically homogeneous composition in all its volume. Second, I'd also like to just go right to the testimony or the counsel statements in 455. He never says evenly distributed. That was a misstatement by my colleague. He just says if they're not distributed uniformly, which is not the case, then it would be an excipient that's not uniformly distributed. We wouldn't have a non-macroscopically homogeneous composition. That's just a truism under the construction. And he says we have lecithin that is uniformly distributed throughout the blend and throughout the tablet course. So it begs the question of what is uniformity? And that's where the district court went awry. You heard nothing from them about how uniformity was understood in the patent, in the prosecution history, and in the art. It doesn't mean flex of color. It refers to the uniform structure. There's some variation in flex of color, and I think it is variation in color that he was relying on, not the fact that there was just a different color. He wants there to be an even arrangement. That's physically impossible to do in these multiparticles. How do you mix it in a huge thing to have a uniform arrangement? So that's the core issue in this case. And we say there's legal error both on uniformity and on homogeneity, and that led to clear error, and there must be at least a vacator and remand. Thank you. Thank you. We thank both sides, and the case is submitted.